## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| Silvestre Cascio, et al., | ) | |
| | ) | |
| *Petitioners*, | ) | |
| | ) | |
| v. | ) | Case No: 13 C 6971 |
| | ) | |
| Rosa Maria Pace, | ) | |
| | ) | |
| *Respondent*. | ) | Judge Frederick J. Kapala |

### ORDER

Petitioners' motion to take judicial notice [37] is granted. Petitioners' verified petition for return of minor children to Italy [1] is denied. This case is closed.

### OPINION

Petitioners, Silvestre Cascio and an Italian public services agency, Azienda Servizi Alla Persona Ambito 9 ("ASP"), have petitioned this court for return of Cascio's two minor children, FC and MC, who are currently residing in Rockford, Illinois with their mother, respondent Rosa Maria Pace. The petition is brought pursuant to the Convention on the Civil Aspects of International Child Abduction (the "Hague Convention" or "Convention"). On December 11 and 12, 2013, this court held a two-day hearing on the matter and allowed the parties to submit post-hearing briefs in support of their position. Having considered the testimony and evidence offered at the hearing and the parties' post-hearing briefs, the petition is denied.

### I. BACKGROUND

#### A. The Hague Convention

The Hague Convention was implemented as an international effort to create an effective deterrent to the practice of international parental kidnaping. See In re Polson, 578 F. Supp. 2d 1064, 1068 (S.D. Ill. 2008). The Convention "is an anti-abduction treaty," which obligates signatories—including the United States and Italy—to promptly return children to the country of their habitual residence when they are "wrongfully removed to or retained in" another country. Redmond v. Redmond, 724 F.3d 729, 731, 739 (7th Cir. 2013) (quotation marks omitted); see also International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. § 11601 et seq. (implementing the Hague Convention in the United States and providing both federal and state courts with the authority to enforce it). However, "'[a] Hague Convention case is not a child custody case.'" Redmond, 724 F.3d at 737 (quoting James D. Garbolino, Federal Judicial Center, The 1980 Hague Convention on the Civil Aspects of International Child Abduction: A Guide for Judge, at ix (2012)). "'Rather, a Hague Convention case is more akin to a provisional remedy—to determine if the child

was wrongfully removed or kept away from his or her habitual residence, and if so, then to order the child returned to that nation.'" Id. (quoting Garbolino, supra); see also Walker v. Walker, 701 F.3d 1110, 1116 (7th Cir. 2012) ("The entire purpose of the Convention is to deter parents from absconding with their children and crossing international borders in the hopes of obtaining a favorable custody determination in a friendlier jurisdiction."). "'The merits of the child custody case—what a parent's custody and visitation rights should be—are questions that are reserved for the courts of the habitual residence.'" Redmond, 724 F.3d at 737 (quoting Garbolino, supra). Accordingly, the authority of this court pursuant to the petition "extends only to the question whether [the children were] abducted and should be returned" to Italy for a determination of custody or whether the children may remain in the United States during that determination; this court does not "sit to resolve a messy domestic conflict." Norinder v. Fuentes, 657 F.3d 526, 530 (7th Cir. 2011).

### B. Factual Background

Much of the factual background pertinent to this order is uncontested. Cascio is a citizen and permanent resident of Italy. Pace, on the other hand, was born in Rockford, Illinois, and has dual U.S. and Italian citizenship. Cascio and Pace met in Italy in July of 1999 and married in late 2000. The children are the result of the marriage, both of whom were born in Italy, and both of whom, according to the parties, have dual U.S. and Italian citizenship.

Between 2000 and 2012, the family lived in Italy, with Cascio providing for the economic needs of the family and Pace acting as a homemaker. In September 2010, Cascio and Pace got into a physical altercation which began with Cascio kicking Pace in her backside and resulted in Pace calling the police. After a police investigation, the matter was referred to the Italian minors court who appointed ASP to monitor and supervise the children, provide support to the parents in parenting skills, and to provide marital mediation between Cascio and Pace. ASP also had to approve, and in turn seek judicial approval of, any decision to move the children. ASP's investigation indicated that, although the parents' relationship was still rife with conflict, the children were well cared for, medically taken care of, happy, and the older child—FC—was academically successful while in Italy. ASP never removed the children from the physical custody of their parents.

During nearly all of the summers between 2000 and 2012, the family vacationed in Rockford, where Pace's mother and extended family lives, for approximately three months at a time. In June 2012, Pace brought the children to Rockford for a summer vacation after informing ASP that she would return on September 2, 2012. Cascio joined Pace and the children on July 27, 2012. The entire family had tickets to return to Italy on September 2, 2012. In late August, Cascio and Pace had an argument in the presence of the children, wherein Pace made it known that she would prefer not to return to Italy, but rather wanted the family to relocate to the United States. Despite that argument, and continued tension for the remainder of the vacation, Pace began packing to return the family to Italy in early September.

From there, the parties' stories begin to diverge. The parties agree that, in the days leading up to September 2, Cascio had several conversations with Alberto Altamore, Pace's cousin and an attorney who lives and works in Rockford, Illinois. Cascio testified that Altamore attempted to pressure Cascio into permitting Pace to remain with the children in the United States and advised Cascio to return to Italy and sell their possessions in order to relocate to the United States. Cascio

claimed that Altamore used an "aggressive tone" throughout these discussions. Altamore, on the other hand, testified that he only had one conversation with Cascio on the topic of the family's return to Italy, and stated that he simply discussed his fear that Pace would not be willing to return as he attempted to lay out Cascio's various options. Altamore explicitly denied becoming aggressive with Cascio.

Regardless, on the morning of September 2, 2012, Pace had her mother, Altamore, Nunzio Pace (her brother), and Silvio Bonura (apparently a cousin to both Cascio and Pace notwithstanding their marriage) attend an impromptu meeting where Pace informed Cascio that she and the children would not be returning to Italy with him that afternoon, and asked that he move to the United States and stay with them. After a period of silence, and then some discussion, Cascio indicated that he consented to her staying in the United States (which he testified meant the children would remain as well) and would move with her to Rockford. Following the meeting, Cascio made a phone call, packed his clothing, and rode to the airport with Nunzio Pace, where he boarded a plane and left for Italy. Pace testified that Cascio returned to Italy to dispose of their property and see to his job, but promised he would return by no later than Christmas. Indeed, Pace and Nunzio Pace both testified that Cascio discussed local employment opportunities and even what car he would like to purchase in the United States on the drive to the airport. Cascio, on the other hand, testified that he only agreed to permit Pace to stay because he felt he was under duress, alone as he was, at the time of the meeting and that he needed to agree in order to be able to catch his flight. He also testified that he thought he could subsequently change Pace's mind and he never had any intention of relocating to the United States or consenting to the children's permanent relocation.

In any event, the parties agree that beginning the next day, Cascio made it clear to Pace that he would not be returning to the United States and that he wanted her and the children to rejoin him in Italy. Pace made it equally clear that she did not plan to return to Italy with the children. ASP was informed of Pace's failure to return on October 1, 2012, after the family missed an ASP-ordered appointment with a psychologist. After some procedural complications in Italy, ASP and Cascio filed a joint petition pursuant to the Hague Convention on September 27, 2013, a few weeks more than a year after Pace and the children failed to return from Rockford. Cascio has remained in contact with the children through Skype and telephone calls, but has not seen or visited them (despite an invitation to do so) since Septeember 2012.

Pace also offered proof as to the children's life in Rockford, which is relevant to one of the exceptions in the Hague Convention. Specifically, MC, the younger child, is four years old, enrolled in pre-school, and spends considerable time with Pace's family and extended family in Rockford. MC speaks English almost exclusively, despite Pace and Nunzio Pace's attempt to keep him bilingual. Similarly, FC, the elder child, is enrolled in his second year of school in Rockford, participates in activities, spends time with friends, attends church, and also spends time with Pace's family. According to Pace, FC struggled with English when he first arrived, but quickly caught on and now remains bilingual. Cascio testified, however, that FC spends more time in the home, seems bored, and is not as active as he was in Italy.

As to the children's living conditions, Pace and the children live with Pace's mother. Pace works full-time as a bank teller, making $10.24 an hour. The children currently lack health insurance, but are currently provided healthcare by a state program and are in good health. Pace's

mother financially assists Pace. In conjunction with her amended petition for divorce, which was filed after the hearing in this case,[1] Pace filed a motion to proceed in forma pauperis based on her inability to pay the filing fees in the divorce proceeding. Nevertheless, the unrebutted testimony at trial was that, based on Pace's family support structure and her own employment, the children are well-provided for in Rockford and enjoy regular outings and significant stability in their lives.

## II. ANALYSIS

In a Hague Convention case, the burden is initially on the petitioner to prove, by a preponderance of the evidence, (1) what signatory state was the child's place of habitual residence immediately before the removal or retention; (2) that petitioner had rights of custody, as defined by the Hague Convention, to the child; and (3) that petitioner was exercising those rights at the time of the retention or removal. See 42 U.S.C. § 11603(e)(1); Redmond, 724 F.3d at 737-38. In the event a petitioner succeeds in setting out the above, then the petitioner has succeeded in proving a prima facie case that the removal or retention was wrongful, and the burden shifts to respondent to assert one of the exceptions set out in articles 12, 13, or 20 of the Hague Convention. In this case, Pace argues that, if the court finds petitioners have met their burden, both the "settled" exception set out in article 12 and the "consent or acquiescence" exception set out in article 13 apply. Both of these exceptions must be proved by a preponderance of the evidence. 42 U.S.C. § 11603(e)(2).

### A. Petitioners' Case for Wrongful Retention

In this case, the parties agree that the children's place of habitual residence was Italy immediately prior to their retention in the United States. The only two issues for the court to decide concerning petitioner's prima facie case, then, are whether the petitioners (1) had rights of custody under the Convention as to the children and (2) were exercising those rights immediately before the time the children were retained in the United States.

### 1. Rights of Custody

The Hague Convention, at article 5, defines "rights of custody" quite broadly as including "rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." This is in contrast to an individual who only has "rights of access," also defined in article 5, which include "the right to take a child for a limited period of time to a place other than the child's habitual residence." Here, the parties agree that Cascio had rights of custody, but Pace objects that ASP's rights were "more of a supervisor than a custodian" and thus "should not be considered by this Court to be a custodian." (Resp't Br. at 17.) Based on the controlling case law, the court rejects that argument.

The unchallenged testimony concerning ASP's obligations to the children include the fact that the family was not permitted to move the children without first obtaining leave from ASP and the minors court. That is sufficient in and of itself—the Supreme Court has held that the right to

---

[1] Cascio requests that this court take judicial notice of the existence of the filing of the amended petition and includes a copy of the petition with its motion. Pace does not object, except to argue that the filing is irrelevant to the issues before the court. Because the court agrees with Cascio that the filing is not irrelevant, and because the filing is not subject to reasonable dispute and is included with the motion, the court grants the motion to take judicial notice. See Fed. R. Evid. 201(c)(2).

veto a child's move, a so-called ne exeat right, qualifies as being a right of custody under the Hague Convention as the right to "determine the child's place of residence." See Abbott v. Abbott, 560 U.S. 1, 10-21 (2010). Additionally, although Pace correctly points out that ASP never exercised the authority, the uncontroverted testimony also suggested that ASP had the authority to remove the children from their parents' care had it been determined necessary to protect the welfare of the children. Accordingly, ASP has proved by a preponderance of the evidence that it also had "rights of custody" on which it may base a petition for return. See E. Sussex Children Servs. v. Morris, 919 F. Supp. 2d 721, 730-31 (N.D. W. Va. 2013) (collecting cases which hold that public social services organizations can have "rights of custody" under the Convention).

### 2. Exercising Those Rights

Although the Hague Convention does not define the exercise of rights of custody, case law indicates that a petitioner's burden to show that he was exercising those rights is minimal. See Habrzyk v. Harbzyk, 759 F. Supp. 2d 1014, 1022 (N.D. Ill. 2011). "Once a petitioner has established that he or she has custody rights under the laws of the country of habitual residence, courts liberally find the exercise of those custody rights." Id. (quotation marks omitted). "Courts have developed two standards for determining if a petitioner was actually exercising his or her custody rights at the time of the allegedly wrongful removal." Id. However, the Seventh Circuit has not yet spoken to which standard applies and the standards are often overlapping and used in conjunction with one another. See id. at 1022-23 (collecting cases). In the first, the petitioner must either show that he sought and had at least minimal contact with the child prior to the removal or retention. Id. In the second, the focus is on whether the petitioner has taken any affirmative acts to abandon the child. See id. at 1023. Nevertheless, "once the Court finds that [a] [p]etitioner exercised his custody rights in any manner, its inquiry ends as the Court must completely avoid the question of whether [p]etitioner exercised the custody rights well or badly." Id. at 1022 (alterations and quotation marks omitted). In this case, regardless of which standard the Seventh Circuit ultimately adopts (or whether it decides to follow a more totality-based hybrid of the two), both Cascio and ASP were exercising their custody rights.

Up to the day of the retention, it is clear based on the record that Cascio was exercising his rights of custody and his parental rights in general. Pace argues, however, that Cascio's alleged consent to Pace's remaining in the United States with the children is an abandonment of those rights, so that Cascio was not exercising his rights at the time of the retention. There is nothing in the record to support Pace's conclusion. At best, the testimony shows that Cascio agreed the entire family would move to the United States, including himself, where he would continue to raise the children and exercise his parental and custodial rights. Under Pace's theory, Cascio then changed his mind about moving, but never gave any indication he was abandoning his parental rights. Cascio's version of the story indicates that he never intended to move to the United States at all, but instead intended to return his family, including the children, to their home in Italy. No where in the record is there any evidence that Cascio left the decision of the children's residence to Pace's sole discretion. Accordingly, while this evidence may support a claim for the defense of consent, which this court takes up infra, Cascio has met his burden to show by a preponderance of the evidence that he was exercising his rights of custody at the time of the retention.

Similarly, the unrebutted testimony concerning ASP indicates that it, too, was exercising its

5

rights of custody at the time of the retention. The record reveals that ASP was still engaged in active monitoring of the family up to the time Pace took the children on vacation to Rockford. Indeed, even Pace acknowledged the ongoing monitoring when she contacted ASP to provide them with the itinerary for the vacation. Furthermore, the record shows that ASP had scheduled a counseling session with a psychologist for the time following the family's expected return date from Rockford, indicating that ASP did not abandon its monitoring duties and still sought contact with and control over the children. Indeed, there is no evidence in the record that the minors court, or any other Italian court, had discharged ASP of its duties to monitor and supervise the family or that ASP had voluntarily abandoned or been lax in those duties. Finally, Ms. Rosetti, ASP's agent which testified in the hearing before this court, indicated that had the parents asked to relocate the child, ASP would have had to give approval and then seek further approval from the court, indicating that ASP had not abandoned the most crucial aspect of its right of custody for the purposes of the Hague Convention. Thus, based on the uncontroverted record, ASP has also met its burden to show by a preponderance of the evidence that it was exercising its rights of custody at the time of the retention.

Consequently, both petitioners have proved, by a preponderance of the evidence, that (1) the children's place of habitual residence was Italy, a signatory to the Hague Convention; (2) they both had rights of custody prior to the retention; and (3) they were both exercising those rights of custody immediately prior to the retention. Accordingly, petitioners have met their burden to show a prima facie case for wrongful retention of the children in the United States.

### B. Respondent's Case for an Exception to Return

The burden now shifts to Pace to prove one of the exceptions applies to prevent return of the children. Pace relies on (1) the "consent or acquiescence" exception from article 13(a); and (2) the "settled" exception from article 12. Pace must prove both of these exceptions by a preponderance of the evidence. See 42 U.S.C. § 11603(e)(2)(B).

### 1. Consent or Acquiescence

Pace first argues that the children should be returned to Italy, notwithstanding the prima facie proof, because Cascio consented to the children remaining in the United States. Article 13(a) of the Hague Convention states that "the judicial or administrative authority of the requested State is not bound to order the return of the child if the person . . . having the care of the person of the child . . . consented to or subsequently acquiesced in the removal or retention . . . ." "The consent exception applies when a petitioning parent, either expressly or through his conduct, agrees to a removal or retention before it takes place." Walker, 701 F.3d at 1122. "A parent's consent need not be formal, but it is important to consider what the petitioner actually contemplated and agreed to in allowing the child to travel outside its home country."[2] Id. (quotation marks omitted). Here, Pace argues that Cascio's agreement that the children would remain in the United States and that he subsequently

---

[2] On the other hand, acquiescence "is implicated if a petitioning parent agrees to or accepts a removal or retention after the fact." Walker, 701 F.3d at 1122. "Unlike consent, acquiescence must be formal, and might include testimony in a judicial proceeding; a convincing written renunciation of rights; or a consistent attitude of acquiescence over a significant period of time." Id. (quotation marks omitted). There is no evidence on the record to support acquiescence, so the court need only concern itself with proof concerning consent.

would move to the United States counts as an express agreement to the retention. Cascio does not deny agreeing to the retention, but argues that his agreement was given under duress and that his subsequent conduct shows that he never actually consented to the retention.

Having seen and heard the witnesses, including observing the demeanor of each, the court finds that Pace, Nunzio Pace, and Altamore each testified credibly and without equivocation, and also finds that Cascio's testimony lacked the same credibility. In addition to Cascio's demeanor while testifying, the court is particularly troubled with Cascio's justification to support his claim that he agreed only under duress. Cascio claims that he agreed to permit the children to remain on a different continent than him because he was afraid of causing an argument and so that he could catch a ride to the airport. The testimony shows that Cascio is certainly not meek, and there is evidence which strongly rebuts any assertion that he is unaccustomed or unwilling to engage in conflict when he deems it necessary. And the second justification, concerning a ride to the airport, is even more incredible. Cascio would have this court believe that he would have rather had his children separated from him by thousands of miles and waste the money already spent on the children's tickets than get into an argument or call a cab. Finally, the court notes that in Cascio's verified and sworn petition, he alleged that Pace stated on September 2, 2012 that if Cascio did not agree to the retention "he would never be able to see his family again." At the hearing, however, Cascio admitted that Pace never said such a thing. For the foregoing reasons, including Cascio's admitted willingness to invent testimony under oath to shade the truth in his favor, the court finds Cascio's testimony to be without credibility.

The court notes, of course, that the parties agree that Cascio began attempting to get Pace and the children to return virtually immediately upon his arrival in Italy. However, while the court considered this fact in its determination, Cascio's post-retention behavior is also consistent with an individual who changed his mind after consenting and then rushed to correct what he thereafter decided had been an error. In short, then, the court finds that Cascio expressly consented to the retention before it occurred, and that his later change of heart is irrelevant, as the Hague Convention does not provide a mechanism for the revocation of consent once given. Accordingly, the court finds that Pace has proven by a preponderance of the evidence that the retention of the children was not wrongful, based on consent, as against Cascio's rights of custody.

However, this conclusion does not, as Pace appears to presume, end the matter. Cascio is not the only petitioner in this case, and there is no evidence that ASP ever consented to, or thereafter acquiesced in, the retention of the children in the United States. Therefore, the court finds that Pace has not proved by a preponderance of the evidence that the retention of the children was not wrongful, based on consent, as against ASP's rights of custody.

### 2. The Settled Exception

Pace's second argument, which would apply to both ASP and Cascio, as to why the children should not be ordered returned to Italy, notwithstanding the <u>prima facie</u> case for wrongful retention, is that the settled exception applies. Article 12 of the Hague Convention states that

> Where a child has been wrongfully removed or retained in terms of Article 3 and, at the date of the commencement of the proceedings before the judicial or administrative authority of the Contracting State where the child is, a period of less

than one year has elapsed from the date of the wrongful removal or retention, the authority concerned shall order the return of the child forthwith.

The judicial or administrative authority, even where the proceedings have been commenced after the expiration of the period of one year referred to in the preceding paragraph, shall also order the return of the child, unless it is demonstrated that the child is now settled in its new environment.

Therefore, in order for the defense to apply, Pace must prove by a preponderance of the evidence that (1) the petition for return was filed more than a year after the retention; and (2) the children are settled in their new environment in Rockford. See Habrzyk, 759 F. Supp. 2d at 1028-29.

Here, although the retention began on September 2, 2012 and the petition was not filed until September 27, 2013, petitioners argue that Pace cannot make use of the settled exception because she cannot show the one year minimum time period to meet the exception. Specifically, Cascio argues that he sought to file a Hague Convention petition well before September 2013, and, through no fault of his own, he was thwarted. ASP argues that it did not even receive notice of the retention until October 2012, and so the filing was not a year from that time. What both petitioners are arguing—although ASP incorrectly couches it as a "knowledge"[3] requirement—is that some form of equitable tolling should apply to reduce the approximately thirteen months between the retention and the filing to some amount of time less than a year, thereby making the exception inapplicable. Some courts have found that when a parent takes steps to hide the child from another parent, equitable tolling will prevent the offending parent from making use of the settled exception in the event that the parent's concealment is successful long enough that the child becomes settled. See, e.g., Duarte v. Bardales, 526 F.3d 563, 570 (9th Cir. 2008); Furnes v. Reeves, 362 F.3d 702, 723 (11th Cir. 2004). However, other courts, including the two most recent to consider the issue, have rejected that argument, and instead found that the settled exception is designed to protect a child from injurious upheaval in its circumstances, and thus the parent's behavior (which will always be a wrongful removal at the point where this exception is in play) is irrelevant to the imposition of the exception. See, e.g., Yaman v. Yaman, 730 F.3d 1, 4 (1st Cir. 2013); Lozano v. Alvarez, 697 F.3d 41, 50-55 (2d Cir. 2012). The Seventh Circuit has not spoken to the issue, but the Supreme Court has accepted certiorari on the question, see Lozano v. Alvarez, ___ U.S. ___, 133 S. Ct. 2851 (2013), and the briefing and oral arguments have both been completed.

Nevertheless, this court need not wade into the fray of which court of appeals is more persuasive or guess as to what the Supreme Court will ultimately hold. Even those cases which permit equitable tolling do so only where there is evidence of fraudulent concealment, that is, where there is evidence that the abducting parent took affirmative steps to conceal their location from the other parent (and presumably others who have rights of custody). See Duarte, 526 F.3d at 570 ("We agree with Furnes and hold that equitable principles may be applied to toll the one-year period when circumstances suggest that the abducting parent took steps to conceal the whereabouts of the child from the parent seeking return and such concealment delayed the filing of the petition for return.");

---

[3]The plain language of article 12 states that the one year period begins to run from "the date of the wrongful removal or retention." There is no mention of the date on which a petitioner gains knowledge of that removal or retention.

Furnes, 362 F.3d at 723 ("We agree with the district court that equitable tolling may apply to ICARA petitions for the return of a child where the parent removing the child has secreted the child from the parent seeking return."); see also Habrzyk, 759 F. Supp. 2d at 1028 ("However, the mere concealment of the child is not enough; for equitable tolling to apply, two conditions must be met: (1) the abducting parent concealed the child and (2) that concealment caused the petitioning parent's delay." (quotation marks omitted)). Here, there is no evidence of fraudulent concealment, Pace took no affirmative steps to hide the children's location from either Cascio or ASP. Indeed, both knew exactly where she and the children were. Furthermore, the evidence in the record supports the conclusion that even if any such concealment had existed, which it did not, the delay in filing was caused by procedural problems arising in Italy with the filing of the petition in a timely fashion, not on account of any of Pace's actions. Accordingly, even if equitable tolling applies in the event of fraudulent concealment (an issue on which this court passes no judgment), that would nevertheless provide no relief to Cascio or ASP. Consequently, Pace has proved by a preponderance of the evidence that the petitioners filed their petition more than one year after the retention of the children, and therefore Pace may assert, and rely, on the settled exception.

The remaining question, then, is whether Pace has proved by a preponderance of the evidence that the children are settled in Rockford. "Though the Convention does not provide a definition for the term settled, the U.S. State Department has declared that nothing less than substantial evidence of the child's significant connections to the new country is intended to suffice to meet the respondent's burden of proof." Habrzyk, 759 F. Supp. 2d at 1029 (quotation marks omitted).

> The factors courts consider in determining if a child has significant connections to the new country include: (1) the child's age; (2) the stability and duration of the child's residence in the new environment; (3) whether the child attends school or day care consistently; (4) whether the child has friends and relatives in the new area; (5) the child's participation in community or extracurricular school activities, such as team sports, youth groups, or school clubs; and (6) the respondent's employment and financial stability.

Id. (quotation marks omitted). Before reviewing each of those factors, however, the court notes that neither party has argued that the court bifurcate its analysis and consider whether it would be appropriate to return one, but maybe not the other, child to Italy. The court presumes that the parties have foregone this argument intentionally so as to not run the risk the court would split the children across two continents. Regardless, as the argument was not made, the court will consider it waived and analyze the children together in determining whether Pace has met her burden to show that the children are settled in the United States.

As to the age of the children, FC was nine as of the time of briefing and MC was four. Although Cascio argues that MC's young age cuts in favor of finding that Pace has not met her burden, courts have been far from consistent in whether they consider a young age to be in favor of a finding of settled. See Broca v. Giron, No. 11 CV 5818(SJ)(JMA), 2013 WL 867276, at *6 (E.D.N.Y. Mar. 7, 2013) ("While the age of the abducted child is a factor to be considered, courts are not in total agreement as to the existence of a correlation between age and degree of settlement. It is possible that a child's tender age could make it easier to recover from repatriation if, for example, the child has little memory of ever having moved in the first place or has made no

substantial ties to the new country. In another case, a very young child may have lived a life devoid of any stability whatsoever in his or her home country, and the idea of uprooting the child yet again (and after a year or more of settlement) may, in connection with the other factors, be deemed repugnant to the aims of the Convention. It is altogether a different case in which the child is old enough to form the type of significant attachments to the United States contemplated by the Convention but, for any number of reasons, simply has not. In that case the home country could very well be the situs of the child's social and educational development notwithstanding a year's (or longer) separation therefrom. Conversely, the age of an older child might cut in favor of a finding of settlement if the child has few relatives, friends, and social involvements in his or her home country, and has them here. Additional permutations and slides along the continuum are conceivable, but needn't all be recounted here. What the Court means to illustrate is that it cannot be said that an older child is either less settled or more settled than a younger child." (citations omitted)). However, although MC's age might raise an inference that he is less likely to form an attachment to a particular place, in this case, the testimony revealed that MC has switched to English as his primary language. His mother and Nunzio Pace both indicated that they have struggled to keep him bilingual in Italian but have been largely unsuccessful thus far. Thus, the court finds that MC's young age does not weigh against applying the exception.

As to the second, third, fourth, and fifth factors, they all weigh in favor of finding that Pace has met her burden to show that the children are settled. The testimony revealed that Pace and the children have resided at the same place since they relocated to the United States—with Pace's mother—and there is no testimony which shows that the children's residence with their grandmother is unstable. The children have been in the United States for slightly more than seventeen months. FC is now halfway through his second school year at a Catholic private school and MC is attending preschool during the week. Apparently MC enjoys his preschool sufficiently that, on Saturday mornings, he cries because the preschool is closed. The hearing was full of testimony concerning the connections the children have to family in Rockford, and mentioned the number of friends FC has made over the time he has been in the United States. Furthermore, FC has been active in both school and church activities, including chess club and choir, and the children have both been attending church and family functions and other social gatherings. Finally, although Cascio testified that FC did not seem as active in the United States as he did in Italy, the court finds that testimony to be without credibility for the same reasons as set out supra.

The sixth factor, Pace's employment and financial situation, is somewhat more complicated. Pace is employed full time and making slightly more than ten dollars an hour. However, she admitted in her petition for divorce that she lacks the capability to provide for her family by herself. Also, the court is concerned that the children lack health insurance, notwithstanding Pace's testimony that they are in good health and receive some health care from a state program. In contrast, however, it is clear that Pace receives support from her sizeable family in the area and there is no testimony to support the conclusion that the family support is in any danger of ending. On the other side of the issue, although it is unclear from the record exactly how much Cascio makes in his current employment, he testified, and was not rebutted, that the children would live in the family home in Italy and that he could accommodate their return without a problem. Nevertheless, in light of the foregoing, the court weighs the sixth factor slightly in favor of finding that Pace has not met her burden.

10

Balancing those factors, the court finds that Pace has met her burden to prove by a preponderance of the evidence that the children are settled in their new environment in Rockford, Illinois. In making that finding, the court has weighed all of the foregoing, but finds particularly compelling the children's ongoing enrollment and success in school and preschool; the testimony concerning the children's strong relationships with their family and active social lifestyle; and the testimony concerning MC's conversion to speaking English almost exclusively. Because Pace has met her burden to prove that the children are settled, the petition, this time as applied to both petitioners, is denied.[4]

### III. CONCLUSION

For these reasons, the petition is denied. This case is closed.

Date: 1/16/2014

ENTER:

_____

FREDERICK J. KAPALA

District Judge

---

[4]The court reminds the parties that this order is not a determination or order of custody. That issue will be determined in further proceedings with another court, either in Illinois state court or in an Italian court. This court's order should not be considered as a ruling as to the fitness of either parent or the merits of any of their custody or support arguments, instead the court has only ruled on the issue before it—whether the Hague Convention, which is designed to prevent and remedy child abduction, applies to the children.